## KNIGHT et al. v. CHICAGO CORPORATION et al.

### No. 11442.

Court of Civil Appeals of Texas.
San Antonio.

Nov. 1, 1944.

Rehearing Denied Nov. 29, 1944.

Neel, King & Rachal, of Corpus Christi, and Dan Moody and J. B. Robertson, both of Austin, for appellants.

Tarlton & Koch, of Corpus Christi, Small, Arney & Small, of Austin, and Tarlton Morrow and Vinson, Elkins, Weems & Francis, all of Houston, for appellees.

NORVELL, Justice.

This is an appeal from a judgment based upon an instructed verdict that appellants, Addie Knight, individually and as survivor in community of the estate of J. B. Knight, deceased, G. Leslie Jackson and

wife, Ollie Jackson, take nothing in an action of trespass to try title.

Appellants in their petition describe the subject matter of this action as being the property or estate conveyed by J. B. Knight and G. Leslie Jackson and their wives to Richardson Petroleum Company by an oil, gas and mineral lease dated October 7, 1940, which is set out in the petition, less the oil, gas and mineral interest conveyed to Knight and Jackson and their wives (the lessors in the lease mentioned) by the Richardson Petroleum Company by an instrument in writing also set out in the pleadings. This interest is an oil payment of $32,000, payable out of 1/32 of 7/8 of production. The lands covered by the lease and the contract for the oil payment consist of 320 acres lying in the McCoy area of the Aqua Dulce Field, Nueces County, Texas.

Defendants below were the Richardson Petroleum Company, the Chicago Corporation, First National Bank of Chicago, Illinois (which holds a first deed of trust lien or mortgage covering various properties of the Richardson Petroleum Company including the leasehold estate of Richardson Petroleum Company in and to the Knight-Jackson tract), Republic Supply Company (which holds a second lien or mortgage against the Richardson Petroleum Company's leasehold estate), E. M. Wilson (the owner of 20/48 of 1/8 of the royalty interest in and to the 320 acre tract. This interest is nonparticipating. Wilson did not sign the unitization agreements hereinafter mentioned), Knox Miller, Charles L. Hairston, administrator of the estate of J. P. Hairston, deceased (Miller and Hairston each own a nonparticipating royalty interest of 4/48 of 1/8 in the Knight-Jackson tract. Both executed the unitization agreements hereinafter referred to), and other parties who hold royalty and leasehold interests in the area pooled or unitized by means of the agreements hereinafter discussed.

Paragraph 8 of the Knight-Jackson and Richardson Petroleum Company lease reads as follows:

"8. The rights of either party hereto may be assigned in whole or in part, and the provisions hereof shall extend to the heirs, successors and assigns, but no change or division in ownership of the land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; provided, *however, that the Lessee, its successors or assigns, shall not make any assignments of undivided interests, overriding royalties or oil payments without the written consent of the Lessors,* save and except assignments to banks and oil well supply companies for the purpose of obtaining money, supplies and equipment to operate and develop the leased premises. And provided further that the Lessee herein shall not assign said acreage in tracts of less than eighty (80) acres, which said 80-acre tracts shall constitute a minimum basis for assignment. *In the event Lessee, its successors or assigns, should attempt to assign any undivided interests, overriding royalty or oil payments without the written consent of the Lessors, other than assignments to banks and oil field supply companies for the procurement of money, supplies and equipment for the operation and development of the leased premises, or should attempt to assign any tract or tracts of less than 80 acres, this lease shall ipso facto terminate as to the interest so assigned, as well as all of the remaining interest owned by the person or corporation making such assignment.* In the event of any assignment or assignments of rights or privileges or interests under this lease, Lessee agrees to mail within sixty (60) days after the execution and delivery of any such assignments, one copy of each of such assignments to all of the lessors named herein, or their assigns, at their post office addresses and failing so to do, said assignment or assignments shall not be binding upon Lessors or their assigns." (Italics ours.)

Oil is now being produced from the lands covered by the lease.

During the latter part of 1942 and early part of 1943, the Richardson Petroleum Company and the Chicago Corporation formed a block or unit within the area in which the 320 acre Knight-Jackson tract is located, for the purpose of developing the natural gas resources of the territory. There being no substantial market for gas in its natural state as taken from the ground, a processing of gas was contemplated so as to recover therefrom certain marketable petroleum products or derivatives in liquid form. The residue gas was to be returned to the production horizon by means of recycling.

In order to effect the unitization proposed, a contract designated as a gas processing and sales contract was entered into

between Richardson Petroleum Company and other holders of oil, gas and mining leases in the territory and the Chicago Corporation. A second contract, designated as a unitization agreement, was also entered into between the Chicago Corporation, Richardson Petroleum Company and certain other holders of oil, gas and mining leases in the territory, as well as the owners of gas royalties therein. These agreements provided for the establishment and operation of a gas recycling plant and a division of the proceeds of such operations between the processor, the Chicago Corporation and the leaseholders and royalty owner who signed the contract. Under the agreements, division of proceeds as between various leaseholders and royalty owners was based primarily upon an acreage basis with the various fractions of the mineral estates involved being also taken into consideration. These contracts related only to the natural gas underlying the lands involved. Numerous counterparts of the agreements were circulated among the various operators and royalty owners in the territory. These contracts became effective in February of 1943, when the requisite number of operators and royalty owners had executed one or more of the counterparts of the agreements to make the same effective as between those executing the same in accordance with the express terms of the agreement. The processing of gas and recycling are now taking place. However, no gas wells nor input wells nor other equipment used in the recycling or processing operations is located on the Knight-Jackson tract.

The leasehold estate of the Richardson Petroleum Company under the Knight-Jackson lease was considered as a part of the properties covered by the unitization agreement and the 320 acres covered by the lease was taken into consideration in effecting a division of the proceeds of the gas processing operations.

Appellants did not sign the unitization agreements, and consequently their contractual rights with reference to the subject matter of the lease of October 7, 1940, are not affected by said agreements.

Appellants contend that the action of the Richardson Petroleum Company in executing the unitization agreements violated the covenant set forth in the first italicized clause of paragraph 8 of the lease, and that the second italicized clause of the paragraph placed a limitation upon the leasehold estate, so that the same terminated upon breach of the covenant. Appellants' alternative contention is that the second italicized clause provided for a forfeiture of the leasehold estate upon breach of a condition subsequent, and that their right of termination was asserted by the filing of this action.

In Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472, 476, the Supreme Court held that a unitizing or pooling agreement constituted "all the lessors of land in the unitized block joint owners, or joint tenants, of all royalties reserved in each of the several leases in such block, the ownership being in the proportion which the acreage of each lease contract bears to the total acreage of the unitized block."

Appellants assert that, under the authority cited, the effect of the Richardson Petroleum Company's having entered into the unitization agreements involved here was to make others who executed said agreements joint owners with Richardson Petroleum Company of the leasehold estate conveyed by the lease of October 7, 1940. It is urged that the unitization agreements consequently operated as assignments of undivided interests by Richardson Petroleum Company, and as appellants did not in writing consent thereto, the restrictive provisions of paragraph 8 of the lease were violated.

If the term "undivided interests" be given its broadest possible meaning, appellants' contention might be upheld. However, the restrictive provision relied upon by appellants is a restraint upon alienation and, when considered in connection with the second italicized clause of paragraph 8, would, according to appellants' contention, operate as a limitation or a condition subsequent supporting a forfeiture. Before such construction can be made effective the language employed in the lease must be so certain that it can be said beyond peradventure that the contracting parties intended to proscribe the type of agreement (the unitizing contracts) employed by the Richardson Petroleum Company is effecting the unitization of the tracts of land consolidated for gas development purposes. The words "pooling agreements," "unitizing contracts," or like specific terms were not employed in the provision prohibiting assignments of cer-

tain types of interests, although pooling or unitizing arrangements for oil and gas development purposes were well known to the Texas oil industry in 1940. The words actually used in the lease were, "Lessee * * * shall not make assignments of undivided interests, overriding royalties or oil payments." These three classes of assignments mentioned are referred to by Professor Summers as per cent. interests. 3 Summers Oil and Gas, Perm. Ed., 327, § 556. According to Summers this type of assignment had its origin in the attempted development of oil and gas leases by persons of limited capital. A certain percentage of the lessee's interest would be sold in order to raise funds for drilling costs. We think the terms undivided interest, overriding royalties and oil payments have certain well defined meanings in Texas. All three types of interest are carved out of and constitute a part of the working interest created by an oil and gas lease. An overriding royalty is a certain percentage of the working interest which as between the lessee and the assignee is not charged with the cost of development or production. The oil payment is similar to the overriding royalty, except that the interest of the assignee ceases upon his receiving a certain amount of money or value out of oil or gas produced from a certain percentage of the working interest. The interest commonly spoken of as an "undivided interest" is an undivided percentage of the working interest, which differs from the oil payment or the overriding royalty in that it is chargeable with its pro tanto share of the cost of development and production.

From the standpoint of a lessor in an oil and gas lease, transfers of per cent. interests of the working interest by the lessee may be objectionable, in that operations under the lease may become unprofitable to a lessee retaining a small percentage interest and consequently be terminated, thus impairing development and production to the detriment of the lessor's royalty interest.

We think it clear that the unitizing agreements involved here are something quite different from what is generally understood by the phrase, "undivided interests," when used in the restricted sense as above set out. These contracts deal primarily with sales, manufacturing and processing.[1]

■ We think that the rule of ejusdem generis has application here. The term "undivided interests" should be construed as describing something similar to an "overriding royalty" or an "oil payment." It should be given a restricted rather than a generic meaning. Right of Way Oil Co. v. Gladys City Oil, Gas & Mfg. Co., 106 Tex. 94, 157 S.W. 737, 51 L.R.A.,N.S., 268.

■ Unitizing and recycling contracts permit the development of the natural gas resources of lands in areas where there

[1] The procedure followed in processing gas in order to recover marketable products in liquid form was described by the witness Gardnier Symonds, president of Richardson Petroleum Company, as follows:

"The procedure would be to produce the gas under very high pressure; take it through a very elaborate processing plant that cost a very substantial amount of money, each plant in excess of a million dollars, where the gas was stripped of the liquid hydro-carbons. From many of them we get base stock for aviation gasoline, such as butane and propane. Then the pressure of the residue gas is raised above the reservoir pressure and by this means it is returned to the same horizon from which it was produced at the well. By this means we hope to get the area scientifically developed and to give the land owner and operator some revenue from the gas itself. * * *

"Gas, when confined at high pressure in the reservoir, holds in a vapor stage various hydrocarbons that liquify at lower pressures and lower temperatures or that can be absorbed out of and from the gas by absorbers found in natural gasoline plants. Under the contract, the operator of the plant is obligated to recover from the gas processed 95% of the pentanes and heavier fractions, which are ordinarily referred to as distillate or condensate and natural gasoline. From the pentanes and heavier fractions you get motor fuel, kerosene, and also a heavy residue. These fractions also form base stock for the manufacture of aviation gasoline. In addition to the pentanes and heavier fractions you can recover normal and isobutane and propane. These component parts of gas are recovered by change in pressure and temperature and by absorption. After they are recovered the remaining gas, known as residue gas, is put back into the formation through another well, but in the same reservoir from which it was originally produced."

exists no market for gas in its natural state and under circumstances where production could not be otherwise obtained by reason of conservation laws and regulations. It seems that if the parties to the lease here involved had intended that the lessee be prohibited from exercising the admittedly valuable privilege of pooling its leasehold with others for gas development, the lease would have clearly and specifically mentioned pooling and unitizing agreements. In our opinion the construction of the phrase "assignments of undivided interests" advanced by appellees is a reasonable one. Appellants' suggested construction is therefore not the only permissible one. In such circumstances a forfeiture (or a termination of the estate upon limitation) will not be decreed. Decker v. Kirlicks, 110 Tex. 90, 94, 216 S.W. 385; Adams v. Fidelity Lumber Co., Tex.Civ. App., 201 S.W. 1034, writ refused.

Another reason why the clauses of paragraph 8 cannot operate as a limitation or a condition subsequent is suggested by appellees' fourth counterpoint which we also sustain.

■ "The law looks with disfavor upon forfeiture provisions. Hence, a construction of the provision as a covenant is to be preferred over its construction as a condition subsequent. Likewise, the interpretation as a condition subsequent is less objectionable than its construction as a special limitation, * * *." A. W. Walker, Jr. The Nature of the Property Interests Created by an Oil and Gas Lease in Texas, loc. cit. 8 Texas Law Review 490.

Appellees contend here that under the rule of strict construction applicable to limitations and forfeitures, the second italicized clause of paragraph 8 of the lease must be held inoperative. Emphasis is placed upon the words "should attempt to assign" appearing in the clause, "In the event lessee * * * *should attempt to assign* any undivided interests overriding royalty or oil payments without the written consent of the lessors * * * this lease shall ipso facto terminate."

■ In discussing the construction of instruments seeking to impose restraints upon alienation the rule is stated by American Jurisprudence as follows:

"§ 74. Construction of Instruments.— Conditions against alienation are strictly construed, and even if they would otherwise be valid are ineffectual unless certainly and clearly expressed. A provision restraining the grantee from 'offering' or 'attempting' to alien is ordinarily void for uncertainty and cannot be restrained. This attitude of the courts is in accord with the general rule that conditions subsequent in conveyances are not to be favored, since they tend to impair the fee or estate granted." 41 Am.Jur. 114.

We further quote from Brothers v. Mc-Curdy, 36 Pa. 407, 78 Am.Dec. 388 (cited by Am.Jur. as authority for the text), as follows: "In Pierce v. Win, 1 Vent. 321, where there was a devise to one, and to the heirs male of his body, with a proviso, that if he does attempt to alien, then immediately his estate should cease, and another should enter, 'the court held the condition void; for a man cannot be restrained from an attempt to alien, for non constat what shall be adjudged an attempt, and how can it be tried? And when the express words are so, there shall not be made another sort of condition than the will imports.' "

■ In connection with the construction of the phrase "should attempt to assign" we also point out this circumstance in the case. The covenant against the assignment of undivided interests places an obligation upon the lessee to refrain from doing a certain act, or prohibits the doing of a certain act. This prohibition is not absolute, however. The act may be done with the written consent of the lessors. Under the contract, therefore, the validity of an assignment of an undivided interest rests with the option of the lessors. The clause therefore possesses the characteristics of a condition subsequent rather than those of a limitation. In our opinion an optional restraint upon alienation of the nature here involved can not operate by way of limitation. Stevens v. G., H. & S. A. Ry. Co., Tex.Com.App., 212 S.W. 639; 4 Kent's Commentaries 127; Walker, 8 Texas Law Review 488.

If we consider the first italicized clause of paragraph 8 of the lease as a covenant, and the second italicized clause as creating a condition subsequent with a right of forfeiture by reason of the breach of the covenant, we have this situation as to the evidence. Appellants knew in the early part of 1943, or prior thereto, that the lessee Richardson Petroleum Company had signed the unitization agreements involved and was attempting to secure the signatures of various other operators and royalty owners in the area so that the unitization plan

would become effective. If these unitization agreements were assignments of undivided interests, then the Richardson Petroleum Company was attempting to assign undivided interests, if we accept the common understanding of the verb "attempt" as being "to make trial or experiment of; to try; to endeavor to do or perform; to assay." Webster's New International Dictionary. The use of the common meaning of the word "attempt" is illustrated by the testimony of the appellant Jackson, viz:

"Q. At that time you knew the attempt had been made to put it in (the Knight-Jackson tract) in the (unitized) block, you knew that in January (1943)? A. Yes.

"Q. Whether that attempt had become effective or not you did not know? A. No, sir, I did not know. * * *

"Q. You knew in July and you knew at all times subsequent to January that Richardson had signed the contract putting the Knight and Jackson acreage in this block? A. I knew he attempted to. I knew that he had signed it after the 22nd."

If the phrase "attempt to assign" be given its ordinary meaning, it is clear that subsequent to the time appellants knew of the "attempt to assign," which by the provisions of the lease is made the basis of a forfeiture, they treated the lease as valid and subsisting, by accepting royalties thereunder and procuring the drilling of an offset well. They have consequently waived their right of forfeiture. Gulf, Colorado & Santa Fe Ry Co. v. Settegast, 79 Tex. 256, 15 S.W. 228; Wisdom v. Minchen, Tex.Civ.App., 154 S.W.2d 330.

Appellants say, however, that they did not know that the leasehold estate in the 320 acre tract had been placed in the pool or unit until after this suit was filed, on October 11, 1943, and the deposition of the president of the Richardson Petroleum Company had been taken; consequently their actions could not operate as a waiver of a breach of condition subsequent. This argument assumes that an "attempt to assign" means the execution and placing in operation of a contract of assignment which would be legally effective except for the restriction against assignments contained in the lease. To place such a construction on the words "attempt to assign" which were those actually employed in the lease, would be to adopt a rule

favoring a forfeiture and run counter to the true applicable rule that "when the express words are so, there shall not be made another sort of condition than the will (or other written instrument) imports."

Thus, if the disputed clauses of the lease be considered as creating a condition subsequent, it is our opinion that the evidence conclusively shows that appellants have waived their rights to insist upon a forfeiture.

Appellants' points fail to disclose a reversible error and the judgment appealed from is accordingly affirmed.