. **A. F. BUCHANAN et al.,**

**v.**

**SINCLAIR OIL & GAS COMPANY.**

**Civ. A. 745.**

United States District Court,
S. D. Texas, Brownsville Division.

Oct. 9, 1953.

Morgan & Shropshire, Fort Worth, Tex., Gibbon & Johnson, Harlingen, Tex., for plaintiffs.

Paul A. McDermott, Fort Worth, Tex., Thomas Fletcher, Vinson, Elkins & Weems, Houston, Tex., Smith & Hubbard, Edinburg, Tex., Cox, Patterson & Freeland, McAllen, Tex., Kelley, Looney, McLean & Littleton, Edinburg, Tex., Otto Wymer, Houston, Tex., Trueheart, Mc-Millan & Russell, San Antonio, Tex., Ray I. Thomas, Corpus Christi, Tex., Strickland, Wilkins, Hall & Mills, Mission, Tex., B. T. Parr, Corpus Christi, Tex., C. A. Edwards, Edinburg, Tex., H. D. Lauderdale, Mercedes, Tex., Stephen E. Rice, Falls Church, Va., for defendants.

ALLRED, District Judge.

By fourth amended complaint plaintiffs seek (1) damages of $146,000 from Sinclair; (2) an accounting by Sinclair for royalty payments; and (3) declaratory judgment that lease No. 377 has terminated under its own terms and removing cloud from plaintiffs' title. Sinclair does not dispute plaintiffs' right to an accounting, but has moved for summary judg-

ment as to damages and the declaratory relief sought. Plaintiffs have filed a counter motion for judgment (except as to the amount of damages). The motions are based on the pleadings and affidavits.

### The Claim for Damages

This is in two parts: First, plaintiffs allege execution of three separate oil and gas leases (Nos. 377, 378 and 379), dated April 2, 1945, in favor of B. C. Young, alleged agent of Sinclair which acquired the leases from Young), each covering a described tract of land; that the final moving consideration for the leases was: (a) an ancillary agreement by Sinclair to sell plaintiffs, at pipeline prices, all the natural gas they would need to operate a dehydration plant and other farm machinery located on the land; and (b) to unitize and form each lease into a separate drilling unit within itself, so that, notwithstanding a provision in each lease authorizing unitization, Sinclair would not, and could not, unitize one lease with the other or with any other lease; that although the lease recites a consideration of $10 "cash in hand paid, the receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained to be performed by the lessee * * *" actually there were other considerations not incorporated in the writing, including (a) $10 per acre cash bonus; (b) that Sinclair would (and did) purchase abstracts and pay for title work; and (c) that plaintiffs agreed to (and did) lease to Sinclair, on substantially the same terms, other lands they then were acquiring; that the true consideration was fully understood and discussed by plaintiffs and Sinclair's agents before execution of the leases and said agents continued to promise and assure plaintiffs that they would have the right to buy, and the company would sell to them, the natural gas necessary for the operation of the dehydration plant and farm operations; that such promises and assurances continued up until a short time prior to the institution of this action; that plaintiffs relied upon this but, dur-

ing the year 1950, Sinclair refused to carry out such agreement; that, as a result of Sinclair's refusal to carry out its oral agreement, plaintiffs were compelled to purchase gas for their operations elsewhere at 18¢ per thousand cubic feet, whereas the gas pipeline prices were 4½¢ to 6¢, resulting in damage to them in the sum of $96,000 (over a period of 10 years—estimated to be the life of the lease).

The second part of the claim for damages is based upon allegations that a short time prior to the execution of the three leases Sinclair's agents prepared and presented to plaintiffs one lease embracing 1939.54 acres; that paragraph 13 of such lease read as follows:

"13. Lessee is hereby granted the right and power to pool or combine the acreage covered by this lease or any portion thereof with other land, lease or leases in the immediate vicinity thereof, in the same section or sections, survey or surveys, or adjoining · section or sections, survey or surveys, into one or more pools or communitized areas, when in lessee's judgment it is necessary or advisable to do so in order properly to develop and operate said premises in compliance with the spacing rules of any lawful authority, or when to do so would, in the judgment of lessee, promote the conservation of the oil and gas in and under and that may be produced from said premises. Lessee shall execute in writing an instrument and furnish a copy thereof to lessor, identifying and describing the pooled acreage. If production is found on the pooled acreage, it shall be treated as if production is had from this lease, whether the well or wells be located on the premises covered by this lease or not. In lieu of the royalties elsewhere herein specified, lessor shall receive, in accordance with the provisions of paragraph "11" hereof, on production from a unit so pooled, only such portion of the royalty stipulated herein as the amount of lessor's acreage placed in the unit bears to the total acreage so pooled in such unit."

that plaintiffs objected to such unitization provision and refused to execute the lease originally prepared; that as part of the consideration, and, as an inducement to plaintiffs, it was agreed that the 1939.54 acres should be then and there pooled and unitized by dividing it into three separate leases, each of which would aggregate approximately 640 acres, the size of a gas unit as authorized by the Railroad Commission of Texas, thereby rendering it unnecessary to further pool the tracts above described; that the three leases thereafter executed according to this agreement were numbered 377, 378 and 379, each consisting of substantially the same number of acres, viz.: Unit No. 1,—656.98 acres; Unit No. 2,—642.12 acres and Unit No. 3, —640.44 acres; that each of such separate leases carried the identical provision authorizing pooling, theretofore contained in paragraph 13 of the original suggested lease; that this division of the 1939.54 acres into three separate units as a part of the consideration, was in conformity with paragraph numbered 13 in each of said leases, reading identically the same, and relieved Sinclair of the option to exercise judgment on its part in attempting to pool or otherwise communitize plaintiffs' property; that, notwithstanding this prior and contemporaneous agreement, Sinclair has disregarded it and arbitrarily attempted to pool and divide the three leases and combine them with adjoining lands and leases in violation of the actual consideration for the execution of such leases; that plaintiffs have been damaged thereby in the sum of $50,000.

Sinclair moves to dismiss these claims for damages on the grounds that it is an effort to vary the terms of the lease by parol evidence, without alleging fraud, accident or mistake.[1]

1. Citing, among others, the following cases: McCamy v. General Electric Supply Corp., 5 Cir., 185 F.2d 944, 945; Reserve Life Ins. Co. v. Buford, Tex.Civ.

■ Plaintiffs contend that the evidence is admissible to show a contemporaneous agreement, not in contravention of the written lease; that oral evidence is always admissible to show the true consideration in a contract; and that, under Common Law Rule of Evidence 24, 11 Vernon's Annotated Texas Civil Statutes, art. 3713, "Parol evidence is admissible to contradict the recital of payment in a deed, receipt or other instrument, and to show the actual amount paid or the real consideration." These general statements are correct, particularly where a nominal consideration and no other is stated.

The parties are not really in disagreement as to the governing principles of law but only as to their application to the lease in question.

■ The parol evidence rule does not apply to collateral undertakings, *where the evidence does not contradict or vary the writing but is consistent therewith;*[2] it may be shown by parol that a contract was delivered, or was to become effective, only upon certain conditions[3] but not where the claimed oral agreement is clearly inconsistent with and would manifestly vary or contradict the express terms of the written agreement;[4] so also recitals of *payment* or consideration not *contractual* in nature, but in the nature of a *receipt*, may be contradicted by parol;[5] the exception—that parol evidence may not be used where the consideration is *contractual*—is equally well recognized.[6] Most of the cases applying the rule, as to *contradicting* recitals of *payment*, deal with a stated nominal consideration;[7] but practically all of them, including the ones cited by plaintiffs,[8] recognize the rule that if the consideration is *contractual* in nature, parol evidence may not be used. Even where a deed recites a cash payment and other considerations *contractual* in nature, it may be shown by parol *that the cash consideration was not paid;*[9] but recital of a cash consideration and other considerations, *contractual* in nature, may be so explicit as to exclude the existence of any other contractual obligations.[10] So, the real test is: does the collateral agreement contradict or vary recited considerations *contractual* in nature?

■ Here we have a stated nominal consideration of $10 "cash in hand paid, the receipt of which is hereby acknowledged" but, *in addition,* "and of the *covenants and agreements hereinafter contained to be performed by the lessee."* (Emphasis supplied.) What are these covenants and agreements; and, will they be altered or added to by the alleged contemporaneous oral agreement or the "additional consideration?" Is the lease

App., 241 S.W.2d 973; Denman v. Hall, 144 Tex. 633, 193 S.W.2d 515; Warner v. Venture Petroleum Corp., Tex.Civ. App., 188 S.W.2d 596; Kidd v. Young, 1945, 144 Tex. 322, 190 S.W.2d 65; Michael v. Busby, 1942, 139 Tex. 278, 162 S.W.2d 662; Hopkins v. City of Dallas, Tex.Civ.App., 1927, 297 S.W. 347; Firestone Tire & Rubber Co. v. Fisk Tire Co., 1945, 131 Tex. 158, 113 S.W.2d 175; Quinn v. Wilkinson, Tex.Civ.App., 1945, 195 S.W.2d 399; Aero-Gas Refining Co., Inc., v. Fisk Tire Co., Tex.Civ.App., 1940, 137 S.W.2d 191; Crumpler v. Humphries, Tex.Civ.App., 1948, 218 S.W.2d 215; Denman v. Kaplan, Tex.Civ.App., 1918, 205 S.W. 739; City of Abilene v. McMahon, Tex.Civ.App., 1925, 271 S.W. 188.

2. 17 Tex.Jur. 825, sec. 370; plaintiffs' brief, p. 36, citing Preston v. Breedlove, 36 Tex. 96 and numerous other cases.

3. 17 Tex.Jur. 842, sec. 382.

4. McCamy v. General Electric Supply Corp., 5 Cir., 185 F.2d 944, 945.

5. 17 Tex.Jur. 849–852, sec. 385; Masterson v. Amarillo Oil Co., Tex.Civ.App., 253 S.W. 908; Binford v. Snyder, 144 Tex. 134, 189 S.W.2d 471, 474.

6. 17 Tex.Jur. 849–857, secs. 385, 386, 387, 388.

7. Such as Stanolind Oil & Gas Co. v. Cerf, Tex.Civ.App., 110 S.W.2d 177.

8. Stanolind v. Cerf, supra; Binford v. Snyder, footnote 5 supra, White v. Hancock, Tex.Civ.App., 238 S.W.2d 801; Stephenson v. Stitz, Tex.Civ.App., 255 S.W. 812.

9. Van v. Webb, 147 Tex. 299, 215 S.W.2d 151, 155.

10. Navarro Oil Co. v. Cross, 145 Tex. 562, 200 S.W.2d 616, 621.

agreement so explicit in covenants and agreements as to exclude the existence of the oral agreement to sell plaintiffs the gas?

As to the alleged agreement to sell plaintiffs gas sufficient for their operations, defendant says there is irreconcilable conflict as follows:

(1) The oral agreement implies an obligation to drill for gas whereas the leases expressly give lessee the option to pay delay rentals in lieu of drilling.

(2) The leases give the lessee an untrammeled right to market its gas at the best advantage whereas, under the alleged oral agreements Sinclair is obliged to reserve an unspecified amount of gas up to plaintiffs' maximum requirements for eight or nine months of the year, thus destroying salability of that part not required by plaintiffs, requiring the lessee to market at a discount to plaintiffs since the cost to them would be discounted by their ⅛th royalty.

(3) Plaintiffs would be given veto power over marketability of the gas, which might result in the loss of the lease or necessitate paying shut-in royalties since the oral agreement might prejudice or prevent a sale of the remainder to an otherwise willing purchaser, or destroy the salability of any gas for the three or four months out of the year when plaintiffs did not need it.

(4) If all wells were drilled to the full spacing permitted by the state railroad commission but the allowable was less than plaintiffs' "maximum requirements," Sinclair would be obliged to drill additional wells to meet the oral agreement.

(5) The oral agreement would conflict with the lessee's right to pay shut-in well royalty provided in paragraph 5.

(6) Paragraph 10 of the leases gives Sinclair the right to use gas for development purposes whereas the oral agreement would be prior to and preemptive of all gas up to plaintiffs' maximum requirements.

I see no conflict in the implied obligation to drill since the oral agreement claimed is to be effective only if and when wells are drilled and production secured. However, there does seem to be a conflict in the other respects claimed by Sinclair. Moreover, it seems to me the alleged oral agreement invades the field which the lease undertakes to cover and does not have for its subject a matter with which the parties might naturally deal separately; but which, on the contrary, they ordinarily would be expected to embody in the writing; and that it is so clearly connected with the principal transaction as to be part and parcel thereof. Cf. the text quoted from 32 C.J.S., Evidence, § 997, pp. 970, 971, quoted in Leyendecker v. Strange, Tex. Civ.App., 204 S.W.2d 845. This conclusion is strengthened by the affidavit of plaintiff A. F. Buchanan that, before signing the lease, they sought unsuccessfully to get Sinclair's agents to incorporate the oral agreement in the lease and, upon this being refused, to give him a letter to that effect.[11]

Sinclair's motion for summary judgment on the $96,000 claim for failure to furnish gas will be granted.

■ As to the claim for damages on account of pooling, I think the conflict is even more clearly irreconcilable. Stripped, plaintiffs' allegations on this point amount to no more than this: originally a lease was prepared covering the entire 1939.54 acres; it contained the provision authorizing the lessee to pool it with other acreage; plaintiffs objected to this and it was agreed orally that three separate leases would be prepared, each covering slightly more than 640 acres, so that thereby each automatically would be unitized as a separate unit and Sinclair would have neither the power nor right

---

11. While there is a conflict between the parties as to whether Sinclair's agents made the oral agreements alleged, (which cannot be resolved on motion for summary judgment), they are in agreement that the matters were *discussed*. I have not, of course, attempted to pass on the conflict (as to whether the oral agreements were made).

to unitize them with each cther or with other leases; the three separate leases, however, embodied the self-same provision authorizing unitization and Sinclair has unlawfully and arbitrarily exercised that power. Thus, without pleading fraud, or mistake, plaintiffs seek to vary and invalidate this clearly stated clause in the written lease. They cannot do it under the authorities they themselves cite.

Sinclair's motion for summary judgment will be granted as to the $56,000 sought on this claim.

### As To Termination of Lease 377

This lease dated April 2, 1945, covers a described 656.98 acres, "more or less." It is for 10 years and as long thereafter as oil, gas, etc., is produced "from said leased premises." It provides for the commencement of a well "on the leased premises" within 12 months or the payment of $656.98 delay rentals. Plaintiffs allege that no well was drilled or commenced and that Sinclair failed to pay the rentals due on April 2, 1950, 1951 and 1952; that, therefore, lease 377 terminated by its own terms.

The affidavits of the parties show without dispute: The rentals were paid in 1946, 1947, 1948 and 1949. After this last payment in 1949, it was determined that plaintiffs did not own 13.98 acres. Sinclair, therefore, paid $643.00 as rental "on 643 acres, more or less," on March 30, 1950, and, at the same time, executed a release of the 13.98 acres. Meantime, on February 14, 1950, Sinclair had executed a "Designation of Unit" instrument including certain described portions of 377, "considered as containing 99.95 acres" in a part of the Buchanan Unit. Thereafter, in January 1951, an amendment was filed to reflect the fact that the included acreage actually contained 104.39 acres (rather than 99.95 acres—a difference of 4.44 acres). Adding this 4.44 acres to the 643 acres for which the rental had been paid in 1950, it was determined that lease 377 actually contained 647.44. Deducting from this the 104.39 acres incorporated in the Bu-

chanan Unit left 543.05 acres outside the Unit but covered by the lease. On March 22, 1951, Sinclair sent to the depository bank a check for $543.05 as the rental on the acreage in 377 outside the Buchanan Unit.

A well was commenced on the unit March 15, 1950, and completed May 4, 1950, as a gas well. It was tested on May 15, 1950, and temporarily shut in. On June 27th and 28th, 1950, flat rate gas well royalty of $99.95, (or $1.00 per acre on the acreage considered to be in the Buchanan Unit), was forwarded to the royalty owners, including plaintiffs, to cover shut-in royalty for the 12 months beginning May 4, 1950.

The well on the Buchanan Unit began to deliver gas, which Sinclair had sold to Tennessee Gas Transmission Co., into the Donna Gas System August 12, 1950, and continued to do so until March 26, 1951, at which time it became incapable of producing into the Donna System, although it did produce some gas on May 5th, 6th, 7th, 1951, when it was shut in for a work-over.

Sinclair's lease department did not learn that the well had ceased to produce until after April 2, 1951. After learning that production had ceased, however, on April 30, 1951, Sinclair forwarded its check to the depository bank for $104.39, covering shut-in rentals on the above acreage included in the Buchanan Unit for the period from April 2, 1951, to April 2, 1952. On July 3, 1951, the bank, pursuant to instructions from the lessors, returned to Sinclair this check for $104.39 and the check for $543.05 (which had been tendered on March 22, 1951).

Meantime, the Buchanan Unit Well, which had been shut down for reworking after May 7, 1951, was reworked and began producing again on May 15th and had continued until after April 2, 1952. Sinclair did not pay or tender rentals for 1952 on the advice of counsel.

Plaintiffs' first proposition is that the payment of $99.95 (instead of $104.39) gas royalty on June 27 or 28, 1950, did not meet the lease requirements and it,

therefore, terminated; first, because $1.00 per acre shut-in royalty was due on 104.39 acres, not 99.95 acres; second, because the lease does not authorize the lessee, during the primary term, to pay shut-in royalties in lieu of the $647.44 delay rental actually due.

As stated, the lease covers a described 656.98 acres "more or less" and provided for delay rentals of $656.98. Paragraph 9 provided for proportionate reduction of royalties and rentals if the lessor owns a less interest than the whole. Therefore, when the 13.98 was released, there remained a balance of 643 acres upon which Sinclair paid $643 on March 30, 1950, thus discharging the delay rental clause until April 2, 1951. Plaintiffs accepted this $643 payment, and, although they plead (in their fourth amended complaint) that the rentals were not paid on the due date in 1950, they have not seriously urged this on brief, rather relying on the fact that there was no production on April 2nd, 1951, and no payment of rentals on that date.

Meantime Sinclair, in February 1950, and unitized a described portion of 377 as a part of the Buchanan Unit, erroneously reciting that it contained 99.95 acres. They commenced a well on this unit in March 1950, completed it in May and then shut it in. Still laboring under the mistaken belief that it contained only 99.95 acres they mailed plaintiffs their proportionate share of a $99.95 shut-in royalty.

Sinclair says that under Scott v. Pure Oil Co., 5 Cir., 194 F.2d 393, and Southland Royalty Co. v. Humble Oil & Refining Co., 151 Tex. 324, 249 S.W.2d 914, production and drilling on the Buchanan Unit preserved lease 377 in its entirety and no rentals were required on or before April 2, 1951, either as to the lands outside the unit (payment of $543.05 on March 22, 1951) or as to the 104.39 acres in the unit (payment of $104.39 on April 30, 1951). In Scott v. Pure Oil, supra, the original lease was to continue as long as oil was produced from "said land." Here, it was to continue as long as oil, gas, etc., is produced from "said leased premises or operations for drilling are continued as hereinafter provided." Plaintiffs say the difference between the pooling provisions render Sinclair's contentions untenable. I, therefore, set out the material parts of each, side by side, for comparison.

### Scott v. Pure Oil

"Lessee shall execute in writing an instrument identifying and describing the pooled acreage. The entire acreage so pooled into a tract or unit shall be treated *for all purposes* except for the payment of royalties as if it were included in this lease, *and drilling or reworking operations thereon and production of gas,* from any stratum or strata so pooled shall be considered *for all purposes* [except the payment of royalties] as if such *operation* were on and such *production* were from the land covered by this lease; whether or not the wells be located on the premises covered by this lease." (Emphasis supplied.)

### Lease 377

"Lessee shall execute in writing an instrument * * * identifying and describing the pooled acreage. If *production* is found on the pooled acreage, it shall be treated as if *production* is had from this lease, whether the well or wells be located on the premises covered by this lease or not. In lieu of the royalties elsewhere herein specified, lessee shall receive, in accordance with the provisions of paragraph (11) hereof, on production from a unit so pooled, *only such portion of the royalty stipulated herein, as the amount of lessor's acreage placed in the unit bears to the total acreage so pooled in such unit.*" (Emphasis supplied.)

In spite of the twice repeated "for all purposes" used in the Scott case, so far as "production" is concerned there is no difference in effect in the two provisions.

In both, "production" on the pooled unit keeps the lease alive even as to leased lands not incorporated in the unit. In addition, however, by express provision, "drilling and reworking operations" on the pooled unit were to be treated as "drilling or reworking operations" on the leased premises in the Scott case, which provision is absent from lease 377. Although the "drilling or reworking operations" clause had no bearing on the Scott decision, since there was production, it means, of course, that there would be no question under the facts here if lease 377 contained the same provision.

"Production" is not expressly defined in lease 377. Paragraph 2 provides that it shall remain in force for ten years and as long thereafter as oil, gas, etc., is "produced from said leased premises." Paragraph 3 provides for a ⅛th royalty on all "oil produced and saved from the leased premises." Paragraph 4 provides for a royalty of ⅛th of the proceeds from the *sale* of gas "produced from any well," or ⅛th of the market value of gas "produced from any well" and used by the lessee for purposes other than development and operation of the lease.

Paragraph 5, the shut-in royalty provision, reads:

"In the event that no earned royalty on oil, gas or casinghead gas is accruing to the lessor under the terms hereof, the lessee shall pay the lessor at the rate of One ($1.00) Dollar per acre per year, payable annually, on each well *where gas only is found,* and while gas is not used or sold during the time said sum is so paid said well shall be held to be a *producing* well under Paragraph two (2) hereof." (Emphasis supplied.)

Paragraph 8 gives the lessee the right, in the event of a dry hole or holes, during the primary term, to *resume drilling operations* or resume the payment of rentals before the next ensuing rental paying date; and if a dry hole is completed less than 60 days before the next ensuing rental date, the lessee has at least 60 days from such completion to commence further drilling or resume payment of rentals. It is especially provided that if a well "drilled upon the leased premises is not productive of oil or gas in commercial quantities and is not abandoned and plugged as a dry hole, such well shall for the purpose of this paragraph be considered a dry hole."

Paragraph 16 provides:

"Notwithstanding anything in this lease contained to the contrary, it is expressly agreed that if during the primary term of this lease or at any time thereafter that this lease is in force by the production of oil, gas or casinghead gas or casinghead gasoline after such primary term, if the lessee shall commence drilling operations during either of said periods, it shall remain in full force and effect and its term shall continue as long as such operations are prosecuted and if production results therefrom, then as long thereafter as such production continues."

While there is no provision in lease 377 that drilling operations on a unit shall preserve the lease, I think the lease was kept alive until April 2, 1951, by the $643.00 rental payment on March 30, 1950, (accepted and retained by plaintiffs). When production was secured in May 1950 and the shut-in royalty paid in June 1950, the lease was in force for one year under its clear provisions. Production was resumed in August and continued to March 26, 1951. This was during the primary term. On April 2, 1951, the well was either a producer or a dry hole. Unquestionably, under paragraphs 8 and 16, Sinclair had the right to resume drilling operations within 60 days. They did that. It resulted in resumed production which production continued beyond April 2, 1952. Under either theory, the lease is still alive by its own terms.

Plaintiffs argue that the pooling provision in paragraph 13 is ambiguous and that Sinclair placed a construction on it requiring rental payments on that part outside the unit, not only as to them but as to Robe, another landowner. But this was prior to the decision in Scott v. Pure

Oil Co., supra. Under that case, I do not believe the lease, considered from its four corners, is ambiguous. The rule of practical construction, therefore, does not apply, American Republics Corp. v. Houston Oil Co., 5 Cir., 173 F.2d 728, and authorities therein cited.

Plaintiffs also point to an article, in 31 Texas Law Review at page 75, discussing Scott v. Pure Oil and suggesting that the Texas courts would not follow the Court of Appeals for this circuit. I agree with the author of the article that the effect of the holding seems harsh, although, as Judge Russell pointed out, the parties seem to have contracted that way. I have no way of knowing what the state courts would hold. All I have is the light of the Scott case; and while it is not as clear as I would like, due to the difference in the fact situation, I feel compelled to follow it.

It becomes necessary to notice again the question of jurisdiction which was not discussed at the outset of this memorandum because the facts above set out are essential to an understanding of the problem.

Originally this action was filed in the State District Court of Hidalgo County by plaintiffs, resident citizens of Texas, against Sinclair, a Delaware corporation and two resident citizens of Texas. Sinclair removed to this court. Plaintiffs' motion to remand was overruled by memorandum dated November 13, 1951. Subsequently, many other resident citizens of Texas were impleaded as indispensable party defendants, (royalty owners in an action to cancel a lease).[12] Answers have been filed by most of them, asserting their interests as royalty owners. None ask that the lease be cancelled. It is clear, however, that all of them would benefit from cancellation; those holding under lease 377 (the only one for which cancellation is now sought) because it would be taken out of the unit and no longer kept alive by it; and those claiming under lands in the unit with which portions of 377 have been unitized, because royalties would be divided on the basis of smaller acreage. The impleaded defendants, therefore, will be arrayed as plaintiffs under Peters v. Standard Oil Co. of Texas, 5 Cir., 174 F.2d 162, and jurisdiction will be retained.

The Clerk will notify counsel, and the parties enumerated at the outset, of this memorandum. Counsel for Sinclair will transmit a decree granting defendants' motion for summary judgment as to (a) the claims for damages; (b) cancellation of lease 377. In view of the multiple claims, these will be severed from plaintiffs' claim for an accounting as to gas royalties and separate trial ordered as to such claim. The Court directs entry of final judgment under Rule 54(b), Federal Rules of Civ.Proc., 28 U.S.C.A., on the claims for damages and cancellation, upon an express determination that there is no just cause for delay and an express direction for the entry of such judgment, which determination shall be incorporated therein.

---

12. Sharpe v. Landowners Ass'n, 127 Tex. 147, 92 S.W.2d 435; Veal v. Thompson, 138 Tex. 341, 159 S.W.2d 472; Leach v. Brown, Tex.Civ.App., 251 S.W.2d 553.