Walter H. MENGDEN, Sr., Petitioner,

v.

**PENINSULA PRODUCTION COMPANY et al., Respondents.**

No. B–5982.

Supreme Court of Texas.

Nov. 24, 1976.

Rehearing Denied Dec. 31, 1976.

Foreman, Dyess, Prewett, Rosenberg & Henderson, Thomas H. Lee, Marilyn Aboussie and William G. Lowerre, Houston, for petitioner.

Ralph J. Graham, Corpus Christi, for respondents.

DANIEL, Justice.

This suit involves the pooling provisions of two adjacent mineral leases which were farmed out to the same assignee; the allocation of production on two gas units formed by the assignee from portions of both leases; and the method of calculating "payouts" and partial reversions under the farmout agreements. Peninsula Production Company, et al., successors in interest of the farmout-assignors, and Walter H. Mengden, Sr., the assignee who formed the gas units, sought declaratory judgments to determine the effective date of Peninsula's reversion or "back-in" right to one-fourth of the working interest on gas production, which was to occur after certain costs were recovered by Mengden.

Peninsula contends that, for the purpose of calculating Mengden's recovery of costs, all of the production from the pooled units should be allocated entirely to the lease farmout on which the wells were physically located. Mengden contends that such production should be apportioned between the two lease farmouts in proportion to the amount of acreage which each contributed to the producing units. Each contributed approximately one-half of the total acreage within the units. The lower courts, based upon a cost recovery provision in the farmout covering acreage upon which the wells were located, agreed with Peninsula and allocated 100 percent of the production from the units to the farmout on which the unit wells were located. 534 S.W.2d 749. We disagree. The judgments of the courts below are reversed and the case is remanded to the trial court for rendition of a judgment in accordance with this opinion.

The two adjacent oil and gas leases, herein referred to as lease "A" and lease "B", each cover 1713.2 acres in La Salle and Webb Counties. They were executed in 1964 and 1965, respectively, by A. E. Schletze, et ux. to Charles H. Stevenson, Jr., Trustee. They contain identical pooling paragraphs which provide in part as follows:

"4. Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease, or any portion thereof as to oil and gas, or either of them, with other land, lease or leases in the immediate vicinity thereof to the extent hereinafter stipulated, when in Lessee's judgment it is necessary or advisable to do so in order properly to explore, or to develop and operate said leased premises in compliance with the spacing rules of the Railroad Commission of Texas, or other lawful authority, or when to do so would, in the judgment of Lessee, promote the conservation of oil and gas in and under and that may be produced from said premises. . . . Operations for drilling on or production of oil or gas from any part of the pooled unit which includes all or a portion of the land covered by this lease . . . shall be considered as operations for drilling on or production of oil or gas from land covered by this lease *whether or not the well or wells be located on the premises covered by this lease,* and the entire acreage constituting such unit or units, as to oil and gas, or either of them, as herein provided, shall be treated *for all purposes,* except the payment of royalties on production from the pooled unit, *as if the same were included in this lease.* For the purpose of computing the royalties to which owners of royalties and *payments out of production* and each of them, shall be entitled on production of oil and gas, or either of them, from the pooled unit, *there shall be allocated to the land covered by this lease and included in said unit a pro rata portion of the oil and gas, or either of them, produced from the pooled unit* after deducting that used for operations on the pooled unit. *Such allocation shall be on an acreage basis* —that is to say, there shall be allocated to the acreage covered by this lease and included in the pooled unit that pro rata portion of the oil and gas, or either of them, produced from the pooled unit which the num-

ber of surface acres covered by this lease and included in the pooled unit bears to the total number of surface acres included in the pooled unit." (Emphasis added.)

The title to lease "A" passed to Miltex Oil and Gas Corporation and certain individual investors and all interest in lease "B" passed to Miltex, less certain reserved overriding royalties. Mengden acquired his interest in the leases through two contemporaneous farmout agreements [1] effective November 15, 1968. Both were negotiated on behalf of the then owners by John Hada, president of Miltex and subsequently president of Peninsula Production Company. The "A" farmout (also referred to as the Miltex farmout) covered 640 acres of the "A" lease, and the "B" farmout (sometimes referred to as the Baria farmout) covered all of the "B" lease. Mengden received a working interest equal to $^{49}/_{64}$ths of $^{8}/_{8}$ths under the 640 acres of the "A" lease and $^{48}/_{64}$ths of $^{8}/_{8}$ths under all of the "B" lease. The "A" farmout obligated Mengden to commence operations within 60 days for drilling a well to test the Escondido sand in the Encinal Field at a specified location. The "B" farmout provided for termination and reassignment if Mengden failed to drill the well provided for in the "A" farmout or if he failed thereafter to commence operations for a well on the "B" lease within 60 days after the "A" lease well was completed or abandoned. Neither agreement contained any provision against pooling or against apportionment of production in the event of pooling. The subsequent assignments recited that they were . . . "in all things subject to the terms and provisions" of the respective oil, gas, and mineral leases. The "B" lease assignment dated November 15, 1968, specifically provided for a proportionate reduction in a reserved overriding royalty in the event of unitization with other lands for the production of gas.

Each farmout provided for a "back-in" or reversion to the assignors of a percentage of the net working interest if and when Mengden recouped from production the expenses of his operations. These reversionary rights are now owned by Peninsula, et al. as to farmout "A" and by Peninsula alone as to farmout "B". Specifically, they provided for reversion to the respective assignors of ¼ of the assigned net working interest under the respective leases as to gas and gas rights and ½ as to oil, oil rights and other mineral rights when Mengden had recovered, after taxes, from "production of oil, gas or other minerals accruing to [the] . . . net working interest therein all costs and expenses incurred by [him]," including the costs of drilling, completing and operating, if productive, and the costs of drilling, plugging and abandoning, if dry, all wells drilled on the leased premises. The "A" farmout, however, contained a special "in lieu of costs" clause which gave rise to this controversy. It provides:

"In connection with the foregoing, it is understood that if you complete any gas well or wells in the Escondido Sand under such lease premises then in lieu of the aforerecited recovery of costs incurred thereon you will be entitled to recover $70,000.00 times the number of such wells on the production accruing to a $^{49}/_{64}$ths of $^{8}/_{8}$ths net working interest therein from such wells before such assignment terminates [reverts] in part as aforeprovided for. . . ."

Mengden drilled five wells on the premises covered by the two farmouts, each of which was located on a separate gas unit of 320 acres pursuant to Railroad Commission

---

1. A farmout or "farm out" agreement is defined by Williams and Meyers as a "very common form of agreement . . . whereby the owner of a lease not desirous of drilling at the time agrees to assign the lease, or some portion of it . . . to another operator who is desirous of drilling the tract . . . The primary characteristic of a farmout is the obligation of the assignee to drill one or more wells on the assigned acreage as a prerequisite to the completion of the transfer to him." Williams and Meyers, Oil and Gas Law, Manual of Terms 167 (1971).

spacing rules. A sketch showing the relative locations of the "A" and "B" farmouts and the five gas units formed by Mengden follows:

"A" (Miltex) farmout

"B" (Baria) farmout

Outline of #1 Unit

Outline of #3 Unit

O   Producing gas well

X   Dry well or meager producer

Wells #1 and #3 were completed as good commercial gas wells in the Escondido sand, each being located on gas units comprised of acreage contributed from the "A" and "B" farmouts.[2] The other three wells were drilled on gas units which were formed

2. Unit 1 was formed with 134.76 acres from lease "A" and 185.24 acres from lease "B". Unit 3 was formed from 185.27 acres of lease "A" and 134.73 acres from lease "B". This was so near a total contribution of 50% of the two units by each of the two leases that the Court of Civil Appeals treated the farmouts as though each had contributed an equal percentage. We do likewise. Mengden filed written designation of the acreage comprising Unit 1

from acreage wholly within the "B" farm-out. Two of these wells, #2 and #5, were dry holes, and #4 was a meager gas producer which will not yield enough to pay for itself.

Gas units #1 and #3 were formed by Mengden in accordance with the pooling terms of the "A" and "B" leases, with the wells located on the lease "A" portions of each unit. Peninsula does not deny the validity of the units. Its pleadings and the trial court's judgment recognize that the portions of the "B" lease included in the #1 and #3 gas units are being perpetuated by Mengden's production from the unit wells located on the acreage contributed from the "A" lease. Neither does Peninsula deny the other normal consequences of pooling. Such consequences are detailed in paragraph 4 of the leases, and they were fully discussed by this Court in *Southland Royalty Company v. Humble Oil & Refining Company,* 151 Tex. 324, 249 S.W.2d 914 (1952). See also *Garza v. De Montalvo,* 147 Tex. 525, 217 S.W.2d 988 (1949); *Brown v. Smith,* 141 Tex. 425, 174 S.W.2d 43 (1943); *Veal v. Thomason,* 138 Tex. 341, 159 S.W.2d 472 (1942); *Leach v. Brown,* 251 S.W.2d 553 (Tex.Civ.App.1952, writ ref'd); *Texaco v. Lettermann,* 343 S.W.2d 726 (Tex.Civ.App. 1961, writ ref'd, n. r. e.); 1A Summers, Oil and Gas § 104, 144–145 (2nd ed. 1954); 35 Tex.L.Rev. 401 (1957). The opinion in *Texaco, Inc. v. Lettermann, supra,* at 732, contains the following statements which are applicable to this case:

"That pooling or unitizing of oil and gas leases is a standard practice in the industry cannot be questioned. It is equally recognized that unitization is often a more feasible method of operation from an engineering and scientific point of view. Unitization can be said to be advantageous to both lessors and lessees. *We think these facts lead to the conclusion that in the absence of clear language to the contrary, pooling clauses should not be construed in a narrow or limited*

on February 3, 1969, and the same as to Unit 3 on March 18, 1969. These designations were recorded prior to Peninsula succeeding to the

*sense. . . .* Appellants have shown good faith in including appellees' leased acreage in two different unitized designations, and have completed a producing gas well on each of the two units. These two wells entitle appellees to their proportionate share of the royalties from each of the two consolidated units, even though one of the wells is not on the land leased by appellees. *Brown v. Smith,* 141 Tex. 425, 174 S.W.2d 43." (Emphasis added.)

From the above cases it must be concluded that, in the absence of an express provision to the contrary in the subsequent assignments or farmout agreements, Mengden had the right to form gas units #1 and #3 from portions of the "A" and "B" leases, and the total unit production and costs should be allocated to each lease in proportion to the number of acres contributed therefrom to the respective units. As heretofore indicated, we have found no provision in the farmout agreements or assignments to Mengden which would prevent or alter the normal rights and effects of the pooling provision of the leases. Peninsula's contention to the contrary is based wholly upon the special $70,000 per well "payout" clause contained in the lease "A" farmout agreement, which clause has been quoted above.

We interpret that clause as applying only to production "accruing to a 49/64ths of 8/8ths net working interest" of any gas wells completed "in the Escondido sand under such lease premises," whether the accrual is from a well on a unit comprised solely of lease "A" acreage or from lease "A's" proportionate share of production from a unit which includes acreage from another lease. Peninsula would place the emphasis on *wells* completed on *such lease premises* rather than on *production accruing to [the] net working interest therein from such wells.* We hold that the latter phrase is controlling, because a consequence

reversionary rights of its predecessors under the farmout agreements.

of pooling is apportionment of production regardless of where the well is located. When a unit is properly pooled, the owners of the minerals or reversionary interests in a separate tract within the unit surrender their right to receive their interest in all production from wells located on their own tract, and in turn they receive the right to share proportionately from wells on the other included tract. *Southland Royalty Company v. Humble Oil and Refining Company, supra.*

The holding of the lower courts to the contrary disregards the fact that approximately one-half of the total acreage in the two units was contributed from the "B" lease farmout and that consequently such proportion of the total production *accrued* to the "B" lease. The holding also disregards the fact that the "B" farmout contained a different method of calculating Mengden's payout and the effective date of Peninsula's "back-in" or reversion as to ¼ of the gas working interest on the portion of the unit contributed from the "B" farmout. It became effective after Mengden recovered from "production accruing" to the net working interest of the "B" lease *all* of his expenses of drilling and operating on lease "B" acreage, including the cost of drilling and abandoning dry holes. These expenses on lease "B" have amounted to considerably more than the $70,000 which Mengden was permitted to recover from production accruing to the net working interest on each gas well completed on lease "A" acreage. If the producing wells had been located on lease "B" portions of the units, it is not likely that Peninsula would contend that the payout provisions of farmout "B" should apply to the entire units. Neither should the payout provisions of farmout "A" apply to the entire units. We hold that payout provisions of both farm-

outs are applicable to the unit wells in proportion to the acreage that each contributed to the units.

To illustrate, if the farmouts contributed equally to the total acreage in the units, the farmout "A" payout provisions apply to the one-half of the production accruing to the acreage it contributed to the units. The farmout "B" payout provisions apply to the other half of the production accruing to the acreage it contributed to the units. Upon the assumption of such equal contribution of acreage, the reversionary rights of Peninsula, et al described in farmout "A" became effective as to the acreage contributed from that farmout on the date when Mengden recovered a total of $70,000 (½ × $70,000 × 2 wells) from the production accruing to a $^{49}$⁄₆₄ths of ⅞ths net working interest in one-half of said units.[3] Based upon the same assumption of equal contribution of acreage, the reversionary rights of Peninsula described in farmout "B" become effective as to the portions of the units contributed from that farmout on the date after Mengden recovers from the production accruing to a $^{48}$⁄₆₄ths of ⅞ths net working interest in unit #4 and farmout "B's" one-half share of units #1 and #3 all expenses incurred by Mengden on the farmout "B" wells, as well as one-half of the costs of the unit #1 and #3 wells. Whether or not this recoupment has already occurred is not shown. The figures on costs and .production were stipulated as of November 22, 1974.[4]

The case is remanded to the trial court with instructions to enter a judgment in accordance with this opinion and based on current figures as to production proceeds and relevant costs. Also, instead of using the approximation of equal contributions from each farmout to units #1 and #3,

3. The record indicates that this amount of recoupment by Mengden has already occurred, but the date thereof is not shown.

4. As of that date *it appears* that Mengden had recovered approximately $200,000 from the net working interest attributable to lease "B" acreage on the basis above stated, and that he had spent on dry holes and initial costs attributable

to farmout "B" acreage approximately $307,-000. The amount received from subsequent lease "B" production, less recoverable costs under the "B" farmout, will of course determine the present status of this reversionary interest. The remainder of farmout "B", except for unit #4 and its proportionate share of units #1 and #3, has terminated.

the trial court will base its judgment on the exact number of acres contributed to each unit from each farmout. In that manner the date when the reversionary interests take effect under the two farmouts will be based on the apportionment of the production from the #1 and #3 gas units, as well as the recoverable costs as set forth in the farmout agreements, between the two farmouts in the proportion that the exact number of acres from each farmout bears to the total number of acres in each unit.

Accordingly, the judgments of the courts below are reversed and the case is remanded to the trial court with instructions to enter judgment in accordance with this opinion.