OPINION ON REHEARING
 

 EVELYN V. KEYES, Justice.
 

 This is an appeal of a judgment awarding $834,299 in damages and $166,250 in attorney’s fees to plaintiff and appellee, Valence Operating Company, for breach of contract by defendant and appellant, Exx-onMobil Corporation, after a three-day bench trial. In six issues, ExxonMobil contends that the trial court erred by (1) misconstruing the maintenance-of-interest provision of the parties’ joint operating agreement; (2) admitting evidence of Exx-onMobil’s relationship with a third party; (3) finding that ExxonMobil breached the maintenance-of-interest provision; (4)
 
 *307
 
 awarding Valence damages for breach; (5) awarding Valence attorney’s fees; and (6) awarding Valence prejudgment interest. As a preliminary matter underlying all of these issues, ExxonMobil contends that Valence should never have been allowed to adduce evidence of breach of contract because it had filed no timely pleading in which it made proper allegations of breach or of damages. By opinion issued October 28, 2004, we modified the judgment and, as modified, affirmed. Both parties moved for rehearing. We now grant the motions for rehearing of both parties, withdraw our October 28 opinion, and issue this opinion in its stead. We affirm.
 

 Factual & Procedural Background
 

 ExxonMobil and Valence are the successors-in-interest to companies that had entered into a joint operating agreement (JOA) in 1988 governing an oil and gas lease in Gregg and Upshur Counties. The lease was known as the Gladewater Gas Unit No. 16 (Unit 16). ExxonMobil’s predecessor was designated operator of Unit 16. It owned 81.8% of Unit 16, and Valence’s predecessor owned 18.2%. As part of the JOA, the parties agreed to a maintenance-of-interest (MOI) provision that limited their right to transfer or to assign their interests in Unit 16. After the JOA was executed, ExxonMobil’s predecessor drilled wells in Unit 16 through the higher Cotton Valley Sand formation and into the lower Cotton Valley Lime formation, three of which produced gas. During the drilling of these wells, it was determined that in the shallower Cotton Valley Sand formation that there were “proven behind-pipe reserves” in Unit 16.
 

 In 1996, ExxonMobil, which had succeeded to its predecessor’s interest, entered into a farmout agreement with Wagner & Brown, Ltd. (WB) and C.W. Resources (CW), giving them the right to drill a well in Unit 16 to a depth sufficient to test the Cotton Valley Sand formation and to earn the conveyance to them of ExxonMobil’s interest in the Cotton Valley Sand portion of Unit 16 upon the successful completion of the test well and the fulfillment of certain other conditions. WB and CW proposed two new wells to Valence. Not knowing that WB and CW had any relationship with Unit 16, Valence did not respond to the new well proposals. Instead, Valence wrote to ExxonMobil and made inquiries. Exxon-Mobil informed Valence about the farmout agreement. Valence still did not respond to WB’s and CW’s proposals and was deemed non-consenting on the two wells. WB and CW subsequently proposed three more wells to Valence, which elected to participate “under protest.” All of the new wells produced. Valence was assessed non-consent penalties on the first two wells pursuant to the JOA.
 

 In March 1998, Valence sued ExxonMo-bil for breach of contract, alleging that ExxonMobil’s decision to farm out a portion of its interest in Unit 16 violated the MOI provision in the JOA. Valence alleged that the MOI provision prevented the parties from transferring interests covered by the JOA unless the conveying party transferred either an undivided interest or the party’s entire interest in Unit 16. Valence also contended that the behind-pipe reserves in the Cotton Valley Sand formation could have been accessed less expensively from the existing wellbores that accessed the Cotton Valley Lime formation than by drilling additional wells and that, by farming out its interest in the Cotton Valley Sand formation, Exxon had breached the JOA and forced Valence to incur non-consent penalties and the additional expenses associated with the drilling of new wells that it would not have incurred but for the breach. Valence sought to recover the non-consent penalties assessed against it
 
 *308
 
 and its share of the difference between the cost of capturing the behind-pipe reserves in the Cotton Valley Sand from the existing wellbores and the cost of drilling additional wells to the Cotton Valley Sand.
 

 On October 10, 1998, upon WB and CW’s fulfillment of the conditions in the farmout agreement, ExxonMobil assigned its interest in the Cotton Valley Sand level in Unit 16 to WB and CW in accordance with the farmout agreement. The date is significant because Valence sued Exxon-Mobil before the date of the assignment and its original pleadings were premised on ExxonMobil’s sale of a segregated portion of its interest in Unit 16 that had not yet happened.
 

 The trial court scheduled the case for trial on February 18, 2000 by a scheduling order dated November 1, 1999. On February 3, 2000, in anticipation of a new trial setting and scheduling order, the parties executed a written Rule 11
 
 [1]
 
 agreement extending those deadlines in the November 1, 1999 scheduling order that had not yet not arrived and establishing March 10, 2000 as the deadline for discovery, motions for summary judgment, and amendments or supplements to the pleadings. The parties agreed that the deadlines established by the court in its new scheduling order would control over the deadlines for those events established in the November 1, 1999 scheduling order. Subsequently, on February 9, 2000, the trial court issued a new scheduling order setting the case for trial on April 11, 2000, but leaving all other deadlines blank.
 

 On April 11, 2000, when trial was not reached, the parties executed a second Rule 11 agreement in contemplation of a later trial setting, in which they agreed that “the deadline for amending pleadings in the above-styled case was March 10, 2000.” In the April Rule 11 agreement, ExxonMobil agreed not to oppose Valence’s filing of its First Amended Petition so long as Valence did not make any changes other than to correct the defendant’s name from Exxon Company U.S.A. to ExxonMobil Corporation. Like the February Rule 11 agreement, the April Rule 11 agreement was written, entitled “Rule 11 Agreement,” signed by counsel for both parties, and filed so that it is part of the clerk’s record.
 

 Three days later, on April 14, 2000, Exx-onMobil filed a sworn “Agreed Motion for Continuance,” requesting a continuance until May 9, 2000. The trial court granted the motion for continuance on the same day. Also on that same day, Valence filed a Second Amended Petition, amending the section entitled “Breach of Contract,” adding the word “assignment” for the first time in regard to the farmout transaction, and seeking for the first time to establish its entitlement to special damages. Exx-onMobil opposed the filing of Valence’s Second Amended Petition and moved to strike it as forbidden by the April Rule 11 agreement.
 

 The trial court subsequently reset the case for trial on six different occasions. By orders entered February 25, 2002, the court denied ExxonMobil’s motion to enforce the parties’ Rule 11 agreements, denied ExxonMobil’s motion to strike Valence’s Second Amended Petition, and granted Valence’s motion to file the Second Amended Petition. Following a bench trial on March 5, 2002, the trial court ruled in favor of Valence and entered findings of fact and conclusions of law. This appeal followed.
 

 Rule 11 Agreements
 

 As a preliminary matter, ExxonMobil argues that the trial court lacked discre
 
 *309
 
 tion to refuse to enforce the parties’ Rule 11 agreements, which it contends set March 10, 2000 as the deadline for amended pleadings and held Valence to its live pleadings as of that date.
 

 To be enforceable, any agreement between parties touching on a pending suit must be in writing, signed, and entered into the court’s record. Tex.R. Civ. P. 11. The purpose of Rule 11 is to ensure that agreements of counsel affecting the interests of their clients are not left to the fallibility of human recollection and that the agreements themselves do not become sources of controversy.
 
 Padilla v. LaFrance,
 
 907 S.W.2d 454, 464 (Tex.1995) (Enoch, J., dissenting) (citing
 
 Wyss v. Bookman,
 
 235 S.W. 567, 569 (Tex. Comm’n App.1921, holding approved) and
 
 Kennedy v. Hyde,
 
 682 S.W.2d 525, 530 (Tex.1984)). The filing requirement creates the imprimatur of a court record.
 
 Padilla,
 
 907 S.W.2d at 464 (Enoch, J., dissenting);
 
 Kennedy,
 
 682 S.W.2d at 528.
 

 A trial court has a ministerial duty to enforce a valid Rule 11 agreement.
 
 See EZ Pawn Corp. v. Mancias,
 
 934 S.W.2d 87, 91 (Tex.1996) (holding that when EZ Pawn agreed to delay hearing as long as Gonzalez filed response at least one week before hearing, but Gonzalez filed response and affidavit one day before hearing, trial and appellate courts erred in considering affidavit);
 
 Fed. Lanes, Inc. v. City of Houston,
 
 905 S.W.2d 686, 690 (Tex.App.-Houston [1st Dist.] 1995, no writ) (holding that when Rule 11 prerequisites were met, trial court had ministerial duty to grant relief in strict accordance with parties’ agreement).
 

 However, it is not sufficient that a party’s consent to a Rule 11 agreement may have been given at one time; consent must exist at the time that judgment is rendered.
 
 See Padilla,
 
 907 S.W.2d at 461 (in reference to agreed judgment);
 
 Trevino v. Houston Orthopedic Ctr.,
 
 831 S.W.2d 341, 344 (Tex.App.-Houston [14th Dist.] 1992, writ denied) (“ ‘The powers of the judge, exercised by virtue of agreement of the parties, extend ... to entering only such judgment as was a literal compliance with the agreement.’ ”) (quoting
 
 Wyss,
 
 235 S.W. at 569). A party has the right to revoke its consent to a Rule 11 agreement at any time before the rendition of judgment.
 
 See Quintero v. Jim Walter Homes, Inc.,
 
 654 S.W.2d 442, 444 (Tex.1983);
 
 cf. State v. Bristol Hotel Asset Co.,
 
 65 S.W.3d 638, 651-52 (Tex.2002) (holding that Rule 11 agreement setting discovery deadline was valid and enforceable when State did not repudiate or object to agreement in trial court).
 

 A court is not precluded from enforcing a Rule 11 agreement once it has been repudiated by one of the parties, but an action to enforce a Rule 11 agreement to which consent has been withdrawn must be based on proper pleading and proof.
 
 See Padilla,
 
 907 S.W.2d at 462;
 
 Quintero,
 
 654 S.W.2d at 444. In such a case, a party may seek to enforce the agreement under contract law.
 
 Padilla,
 
 907 S.W.2d at 461;
 
 Davis v. Wickham,
 
 917 S.W.2d 414, 416 (Tex.App.-Houston [14th Dist.] 1996, no writ). This inquiry requires full resolution of the surrounding facts and circumstances.
 
 Quintero,
 
 654 S.W.2d at 444.
 

 In this case, ExxonMobil contends that the April Rule 11 agreement held Valence to its live pleadings as of March 10, 2000 and that Valence breached the agreement by filing its Second Amended Petition on April 14, 2000 — three days after the April Rule 11 agreement was executed. Valence contends that the April Rule 11 agreement was an agreement only that ExxonMobil would not
 
 oppose
 
 its First Amended Petition if Valence made no changes other than to substitute the name of the correct de
 
 *310
 
 fendant and that Valence made no other changes in its First Amended Petition. Valence contends that the March 10, 2000 deadline for filing amended pleadings was “never intended to be a permanent deadline for amendment of pleadings.”
 

 An agreement between parties will not be given greater effect than intended.
 
 Austin v. Austin,
 
 603 S.W.2d 204, 207 (Tex.1980). Here, the parties clearly contemplated that their February Rule 11 agreement setting discovery and pleading deadlines would be replaced by the new scheduling order contemplated in the agreement. Indeed, the parties expressly agreed “that the deadlines in the old Scheduling Order dated November 1, 1999 that have not yet arrived as of this date shall be extended as follows” and “that the deadlines established by the Court in the new Scheduling Order for the Pre-Trial Conference and Trial shall govern and control over the deadlines for those events established in the old Scheduling Order dated November 1, 1999.” The subsequently issued February 9, 2000 scheduling order set a new trial date — April 11, 2000 — but did not otherwise set deadlines, raising the issue of whether the parties intended that the deadlines that had then all passed remain in effect, as ExxonMobil contends, or whether they intended that those deadlines revert to the default position under the Texas Rules of Civil Procedure, as Valence argues.
 
 [2]
 

 Under its plain language, the April Rule 11 agreement merely confirmed “ExxonMobil’s non-opposition to Valence’s filing of Plaintiffs First Amended Petition,” which was predicated upon Valence’s representation that the First Amended Petition would only substitute ExxonMobil Corporation in lieu of Exxon Company USA as the defendant and would not assert a new cause of action or amend the cause of action set out in Valence’s Original Petition. As agreed, Valence made no other changes in its First Amended Petition, and Exxon did not oppose the filing of the petition. The April Rule 11 agreement was silent as to Valence’s right to file subsequent pleadings or ExxonMobil’s right to oppose any such pleadings. Moreover, the February Rule 11 agreement contained no express statement of the parties’ intention that the agreement continue in effect when all deadlines contemplated by the February 9, 2000 scheduling order had passed. Rather, the statement in that agreement that the anticipated “new Scheduling Order shall govern and control over the deadlines for those events established in the old Scheduling Order” and Valence’s prompt rejection of ExxonMo-bil’s claim that the agreement precluded all amended pleadings after March 10, 2000 both argue against a meeting of the minds that the deadlines established in the February Rule 11 agreement were intended to be permanent and to preclude the future amendment of pleadings. Indeed, the April Rule 11 agreement refers to the February Rule 11 agreement in the past tense, stating, “ExxonMobil and Valence agree that the deadline for amending pleadings in the above-styled case
 
 was
 
 March 10, 2000.” (Emphasis added.)
 

 Despite the lack of any express statement in either the April or the February Rule 11 agreement that Valence agreed to make no changes to its pleadings after March 10, 2000, other than to substitute
 
 *311
 
 the correct name of the defendant, Exxon-Mobil now asks us to interpret the April Rule 11 agreement as a contract binding Valence by stipulation to its pleadings as of 11:59 p.m., March 10, 2000,
 
 i.e.,
 
 as binding Valence to its Original Petition — a pleading that was filed before ExxonMobil had completed the sale of its interest in the Cotton Valley Sand portion of Unit 16 to WB and CW and that did not seek special damages.
 

 A stipulation is an agreement, admission, or other concession made in a judicial proceeding by the parties or their attorneys.
 
 Rosenboom Mach. & Tool, Inc. v. Machala,
 
 995 S.W.2d 817, 821 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). It constitutes a binding contract between the parties, may be used to limit or exclude the issues to be tried, and even obviates the need for proof on the litigable issue.
 
 Id.
 
 at 821-22. “In construing a stipulation, a court must determine the intent of the parties from the language used in the entire agreement, examining the surrounding circumstances, including the state of the pleadings, the allegations made therein, and the attitude of the parties with respect to the issue.”
 
 Id.
 
 at 822. A stipulation should not be given greater effect than the parties intended.
 
 Id.; Austin,
 
 603 S.W.2d at 207.
 

 Viewing the February and April Rule 11 agreements in light of the circumstances surrounding their execution, the early state of the pleadings when the agreements were made, the procedural history of this case, and the dispute between the parties, we hold that the trial court did not abuse its discretion in rejecting ExxonMo-bil’s interpretation of the Rule 11 agreements, denying ExxonMobil’s motion to enforce the Rule 11 agreements as it interpreted them, and permitting Valence to file its Second Amended Petition. We overrule ExxonMobil’s preliminary argument. We therefore turn to ExxonMobil’s other issues on appeal.
 

 Breach of Maintenance-of-Interest Provision
 

 In its first two issues, ExxonMobil contends that the trial court erred by misconstruing the MOI provision of the JOA entered into by ExxonMobil's and Valence’s predecessors and by concluding that Exx-onMobil breached the JOA by executing a farmout agreement with WB and CW that violated the MOI provision. The MOI provision in Article VIII.B of the JOA provides:
 

 E. Maintenance of Uniform Interest: For the purpose of maintaining uniformity of ownership in the oil-and gas leasehold — interests—covered—by—this agreement, — and Notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract Area and in wells, equipment and production unless such disposition covers either:
 

 1. the entire interest of the party in all leases and equipment and production; or
 

 2. an equal undivided interest in all leases and equipment and production in the Contract Area.
 

 Every such sale encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the rights of the other parties.
 

 (Strikeouts in original.)
 

 ExxonMobil contends that the trial court erred in agreeing with Valence that the MOI provision prevented the parties from transferring interests covered by the JOA unless the conveying party trans
 
 *312
 
 ferred either an undivided interest or the party’s entire interest in Unit 16. Exxon-Mobil argues that, by striking the language stating that the purpose of the MOI provision was to maintain “uniform” ownership in the leasehold interests covered by the JOA, the original parties to the MOI provision indicated their intention
 
 not
 
 to require the maintenance of uniform interests. ExxonMobil further contends that, under its plain language, the MOI provision applies only to the sale, encumbrance, transfer or other disposition of a party’s “interest in the leases embraced within the Contract Area
 
 and
 
 in wells, equipment and production” and that it did not breach the JOA by farming out a portion of its interest in Unit 16 because it did not assign or sell its interest in the lease
 
 and
 
 its interest in the wells, equipment, and production thereon. (Emphasis added.)
 

 Valence argues that ExxonMobil’s interpretation of the MOI provision vitiates the provision. The original parties’ striking of references to the maintenance of
 
 uniform
 
 interests merely recognized the reality that the parties to the JOA did not have uniform interests to maintain: ExxonMobil had an 81.8% interest in the leases and the wells, equipment, and production thereon; Valence, an 18.2% interest. Valence contends that the MOI provision memorialized the intent of the parties to maintain whatever interests they had under the JOA when it was executed. Valence points out that the material language of the MOI provision — language requiring that a party that disposes of its interest in the leases and the wells, equipment, and production covered by the JOA must dispose of its entire interest or an equal undivided interest — becomes meaningless if the provision is
 
 not
 
 intended to maintain the parties’ respective interests in the lease when it transfers its entire interest in a portion of the lease. Valence argues that its own interpretation of the MOI provision is, therefore, reasonable, while ExxonMobil’s is not.
 

 In interpreting a joint operating agreement, we apply principles of contract law.
 
 See Sun Oil Co. v. Madeley,
 
 626 S.W.2d 726, 727, 731 (Tex.1981). In construing a contract, it is the primary task of the court to determine the parties’ true intentions as expressed in the agreement.
 
 Id.
 
 at 727-28;
 
 Coker v. Coker,
 
 650 S.W.2d 391, 393 (Tex.1983). The court should read and examine the entire writing to ascertain the agreement of the parties, ensuring that all provisions are harmonized and given effect and none is rendered meaningless.
 
 Coker,
 
 650 S.W.2d at 393. When an unambiguous writing has been entered into by the parties, the courts will enforce the intention of the parties in the instrument as written.
 
 Sun Oil,
 
 626 S.W.2d at 731.
 

 Ordinarily, the intent of the parties may be discerned from the instrument itself. However, when a question relating to the construction of a contract is presented, we are required to take the wording of the instrument, consider it in the light of the surrounding circumstances, and apply the rules of contract construction to determine the meaning.
 
 Id.
 
 If, in light of the surrounding circumstances, the language is capable only of a single meaning, we can confine ourselves to the writing.
 
 Id.
 
 Our examination of the circumstances surrounding the execution of a contract is, however, only an aid to construction.
 
 Id.
 
 A contract is unambiguous if it can be given a certain or definite legal meaning.
 
 Id.
 
 at 731-32. If, after applying the rules of construction, the contract is subject to two or more reasonable interpretations, the contract is ambiguous, and a fact issue is created on the parties’ intent.
 
 Columbia Gas Transmission Corp.
 
 
 *313
 

 v. New Ulm Gas, Ltd.,
 
 940 S.W.2d 587, 589 (Tex.1996). However, an ambiguity does not arise simply because the parties advance conflicting interpretations of the same language; for an ambiguity to exist, both constructions must be reasonable.
 
 Id.
 
 We must decide, therefore, whether the MOI provision is capable of only one reasonable interpretation, considering the wording of the instrument under the rules of contract construction in light of the surrounding circumstances. In this light, we first examine the farmout agreement to determine its effect on the interests governed by the JOA.
 

 A farmout agreement is an assignment by a lease owner of all or a portion of the lease to another operator who desires to drill on the tract.
 
 United Oil & Minerals, Inc. v. Costilla Energy, Inc., 1
 
 S.W.3d 840, 843 n. 2 (Tex.App.Corpus Christi 1999, pet. dism’d). The primary characteristic of the farmout is the assignee’s obligation to drill one or more wells on the assigned land as a prerequisite to completion of the transfer.
 
 Eland Energy, Inc. v. Rowden Oil & Gas, Inc.,
 
 914 S.W.2d 179, 182 n. 1 (Tex.App.-San Antonio 1995, writ denied) (quoting
 
 Mengden v. Peninsula Prod. Co.,
 
 544 S.W.2d 643, 645 n. 1 (Tex.1976)). The farmout may be in the form of either an agreement to transfer or a conditional assignment.
 
 Id.
 
 at 182 n. 2. In an agreement to transfer, “the farmee obtains its rights after it performs the prerequisite conditions” set out in the agreement, whereas, “in a conditional assignment, the farmee acquires its interest in the property when the agreement is made, and is required to reconvey its interest only if its obligations under the agreement are not performed.”
 
 Id.; see Martin Exploration Co. v. Amoco Prod. Co.,
 
 637 So.2d 1202, 1203 n. 1 (La.App. 1 Cir. 5/20/94),
 
 writ denied,
 
 94-2003 (La.11/4/94, 644 So.2d 1048) (holding that farmout agreement is contract to assign oil and gas lease rights in land upon completion of drilling operation and performance of other provisions contained in contract);
 
 Rogers v. Ricane Enters., Inc., 772.
 
 S.W.2d 76, 78 (Tex.1989) (holding that where assignment conveyed all “rights, title, interest and privileges” in leasehold estate to farmee and provided that drilling provision had to be satisfied or interest would revert to owner, agreement was conditional assignment).
 

 The farmout agreement between ExxonMobil and WB and CW was an agreement to transfer. ExxonMobil agreed that, upon WB and CWs compliance with all conditions of the farmout agreement and completion of a well capable of producing oil or gas in paying quantities, ExxonMobil would assign to WB and CW all of its “present right, title and interest (herein referred to as ‘interests in land’) in and to the land described below, subject to the limitations and reservations herein contained, insofar as said interest in land covers oil and gas only in and under the following described lands (hereinafter referred to as ‘Farmout Area’).” Essentially, ExxonMobil agreed that WB and CW could earn a conveyance of all of ExxonMobil’s interests in land in Unit 16, subject to depth limitations. The depth limitations limited the conveyance to Exx-onMobil’s interest in the Cotton Valley Sand formation and did “specifically reserve and except from the agreement all rights from and below the stratigraphic equivalent of the Base of the Cotton Valley Sand Formation.” By its plain language, therefore, the farmout agreement evinced ExxonMobil’s agreement to convey its entire leasehold interest in a
 
 portion
 
 of Unit 16 to WB and CW, namely the Cotton Valley Sand formation, not an undivided interest or its entire interest in Unit 16 as required by the MOI provision of the JOA.
 

 
 *314
 
 We do not agree with ExxonMobil’s argument that it did not breach the MOI provision because it conveyed only a portion of its interest in the
 
 lease,
 
 not a portion of its interest in “wells, equipment, and production” as well. ExxonMobil expressly agreed in the farmout agreement to assign to WB and CW
 
 “all
 
 of our present right, title and interest (herein referred to as ‘interests in land’)” in a segregated portion of Unit 16, subject to the retention of royalties. When ExxonMobil transferred its
 
 entire
 
 interest in land in the Cotton Valley Sand portion of the Unit 16 oil and gas lease, it executed a conveyance of realty that transferred its interest in the wells, equipment, and production appertaining to the Cotton Valley Sand formation.
 
 See Rogers,
 
 772 S.W.2d at 80 (“An oil and gas lease conveys an interest in real property as does the assignment of all or a portion thereof.”);
 
 Cherokee Water Co. v. Forderhause,
 
 641 S.W.2d 522, 525 (Tex.1982) (holding that oil and gas lease is sale of interest in land that vests lessee with title to oil and gas in place);
 
 Kentucky Bank & Trust Co. v. Ashland Oil & Transp. Co.,
 
 310 S.W.2d 287, 290 (Ky.1958) (holding that oil well is part of real estate and oil in place is part of land);
 
 Renwar Oil Corp. v. Lancaster,
 
 154 Tex. 311, 276 S.W.2d 774, 776 (1955) (holding that oil and gas lease is contract in sense that it is conveyance of realty upon terms and conditions that may be contractual).
 

 We agree with Valence that the striking of references to the maintenance of “uniform” interests in the MOI provision merely clarified the parties’ recognition that the interests of the parties in Unit 16 were not uniform. The intent of the parties in including the MOI provision in the JOA was to ensure that any party’s conveyance of an interest under the lease conveyed either the party’s entire interest or an equal undivided interest in all leases and equipment and production in the contract area. In short, the MOI provision evinces the intent of the parties not to partition the undivided interests in the leases.
 
 See Dimock v. Kadane,
 
 100 S.W.3d 602, 608 (Tex.App.-Eastland 2003, pet. denied) (construing “Acquisition, Maintenance or Transfer of Interest” clause of JOA). Yet that is exactly what ExxonMobil did.
 

 Because the plain language of the MOI provision in the JOA required that Exxon-Mobil not partition its interest in Unit 16, but that it convey either its entire interest or an equal undivided interest in all leases, wells, equipment, and production in the contract area, ExxonMobil breached the MOI provision of the JOA by conveying its interest in a portion of Unit 16 to WB and CW, namely, by conveying to them its interest in the Cotton Valley Sand formation while retaining its interest in those formations beneath the Cotton Valley Sand. We hold that the trial court did not err in finding that ExxonMobil breached the MOI provision in the JOA by conveying a portion of its interest in Unit 16 to WB and CW.
 

 We overrule ExxonMobil’s first and second issues.
 
 [3]
 

 
 *315
 
 Damages
 

 In its third issue, ExxonMobil argues that there is no evidence to support the trial court’s findings that ExxonMobil caused Valence’s damages.
 

 The trial court found that ExxonMobil's breach of the JOA caused Valence to be subjected to the additional expense of drilling wells in producing formations already accessible from existing wells, resulting in damages to Valence of $810,867.28. It also found that ExxonMobil’s breach caused Valence to be subjected to the non-consent provisions of the JOA, resulting in damages of $528,432. We consider these findings separately.
 

 Additional Expense Caused by Drilling of New Wells
 

 ExxonMobil contends that the trial court erred in awarding Valence $310,867.28,
 
 i.e.,
 
 one-half the amount of damages that Valence sought to recover for the drilling costs that the court found Valence was forced to incur by being required to participate in the drilling of the new Cotton Valley Sand wells rather than being able to produce the Cotton Valley Sand gas from the wellbores of the three existing Cotton Valley Lime wells— $621,735. ExxonMobil contends that Valence’s proof of such damages was speculative because there was no evidence that Valence ever proposed a dually completed well to WB and CW. ExxonMobil further contends that the trial court merely assumed that Valence would have proposed a dual completion to ExxonMobil, that Exx-onMobil would have agreed to the dual operation of the three existing Cotton Valley Lime wells, and that the Railroad Commission would have granted Exxon-Mobil permission to complete the existing' wells.
 

 In rebuttal, Valence argues that its damages were not speculative because, under the JOA, it had the right to a completion in the Cotton Valley Sand from the existing Cotton Valley Lime wellbores. Valence points to evidence in the record that it wanted to produce the Cotton Valley Sand gas from the existing wellbores and that the reserves were there. Valence also points to evidence in the record establishing not only the cost of drilling the new wells but the cost of completing the Cotton Valley Sand wells with the existing well-bores and its capability of completing the existing wells.
 

 The purpose of the MOI provision was to ensure that the parties to the JOA retained the same interests in the lease that they had when they executed the contract unless specified conditions were met. By farming out and subsequently selling its interest in the Cotton Valley Sand portion of the Unit 16 lease, while retaining its interest in the producing wells in the Cotton Valley Lime, ExxonMobil relieved itself of the costs of exploiting the gas in the Cotton Valley Sand formation while retaining an overriding royalty interest in any production obtained. The new operators, WB and CW, having no interest in production from the existing Cotton Valley Lime wells, had no interest in minimizing the number of wells in Unit 16 or in exhausting the production from the Cotton Valley Lime formation and then using the existing wellbores that ran through the Cotton Valley Sand formation into the Cotton Valley Lime to recover the behind-pipe reserves in the higher formation; their sole interests were to obtain maximum
 
 *316
 
 production of gas from the Cotton Valley Sand formation and to obtain conveyance to themselves of ExxonMobil’s interest in Unit 16 at that depth. Valence, by contrast, had an interest both in continuing production from the Cotton Valley Lime formation and in exploiting the behind-pipe reserves in the higher Cotton Valley Sand formation from the existing wellbores, for which it had already paid 18.2% of the drilling costs. Had ExxonMobil not breached the JOA by farming out, and subsequently selling, its interest in the Cotton Valley Sand level of Unit 16, it would have continued to have the same interest that Valence had in capturing as much oil and gas as possible from the
 
 entire
 
 unit by the most economical means that would maximize returns from the whole. By assigning its interest in the Cotton Valley Sand portion of Unit 16, ExxonMobil severed its interest from Valence’s, rather than maintaining it, thereby breaching the JOA and causing Valence to incur the extra costs associated with drilling the new wells side by side with existing wells that could have been completed to access the same reserves.
 

 Valence argues and its experts attested that the most economical means to have captured the oil and gas in the whole of Unit 16 would have been to use the existing wellbores drilled to the Cotton Valley Lime formation to access the behind-pipe reserves in the Cotton Valley Sand. Thus, Valence sought as damages for ExxonMo-bil’s breach the difference between the expenses incurred in drilling the new wells to the Cotton Valley Sand and those expenses that would have been incurred had the Cotton Valley Sand reserves been accessed from the existing Cotton Valley Lime wellbores.
 

 Damages for breach of contract include consequential damages.
 
 Stuart v. Bayless,
 
 964 S.W.2d 920, 921 (Tex.1998);
 
 Naegeli Transp. v. Gulf Electroquip, Inc.,
 
 853 S.W.2d 737, 739 (Tex.App.-Houston [14th Dist.] 1993, writ denied). “[T]he measure of [breach of contract] damages is just compensation for the loss or damage actually sustained.”
 
 Stamp-Ad, Inc. v. Barton Raben, Inc.,
 
 915 S.W.2d 932, 936 (Tex.App.-Houston [1st Dist.] 1996, no writ). A trial court has discretion to award damages within the range of the evidence presented at trial.
 
 Duggan v. Marshall,
 
 7 S.W.3d 888, 893 (Tex.App.-Houston [1st Dist.] 1999, no pet.).
 

 Valence presented evidence at trial that the cost of drilling a well to the Cotton Valley Sand formation was $719,354. The same evidence showed that it would have cost only $150,000 to complete the Cotton Valley Sand wells from the existing Cotton Valley Lime formation wellbores. The trial court awarded Valence $310,867.28, representing its 18.2% interest in the difference between $719,354 and $150,000, multiplied by three for the cost of drilling the three wells. Accordingly, we hold that the trial court did not err in awarding damages for additional drilling costs incurred by Valence as a result of Exxon-Mobil’s breach of the JOA.
 

 We overrule this portion of ExxonMo-bil’s third issue.
 

 Non-Consent Penalties
 

 The non-consent provision of the JOA stated that, if any party to the agreement desired to drill a new well on the Contract Area, the party desiring to drill the well
 

 shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective, formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30)
 
 *317
 
 days after receipt of the notice within which to notify the parties to do the work whether they elect to participate in the cost of the proposed operation .... Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.
 

 The agreement further provided that if any party elected not to participate in the proposed operation the party giving notice and the participating parties had to commence work on the proposed operation within a specified period of time and complete it with due diligence. Once operations began, each non-consenting party was deemed to have relinquished its interest to the consenting parties, and the consenting parties were deemed to own and to be entitled to receive, in proportion to their interests, all of the non-consenting party’s interest in the well and share of production until each consenting party had recovered 100% of the costs of any newly acquired surface equipment and 300% of the costs attributable to the non-consenting party.
 

 ExxonMobil contends the trial court erred in awarding Valence $523,432.00 for its subjection to the non-consent provisions of the JOA because these damages did not result from its own farmout and assignment of its interest in the Cotton Valley Sand formation to WB and CW, but from Valence’s inaction in response to WB’s and CW’s well proposals; ExxonMobil argues that Valence is not entitled to recover damages for penalties that it incurred by its own inaction or, alternatively, that it failed to mitigate.
 

 Valence offered proof at trial that Exx-onMobil failed to comply with the notice terms of the JOA. ExxonMobil made no attempt to give Valence written notice of the farmout agreement or of its proposal that WB and CW drill an exploratory well into the Cotton Valley Sand formation to recover the behind-pipe reserves. Exxon-Mobil did not specify to Valence the work to be performed, the location, the proposed depth, the objective, or the estimated cost of the operation — although the express language of the JOA required such notice. ExxonMobil did not give the required notice because it had farmed out the exploitation of the behind-pipe reserves in the Cotton Valley Sand formation to non-parties to the JOA, causing Valance to incur the additional costs of drilling new wells next to existing wellbores that could have been completed to access the same reserves at much less cost
 
 and
 
 causing Valance to incur the penalties associated with not consenting to the greater drilling costs consequent on ExxonMobil’s breach of the JOA.
 

 Valence’s failure to consent to the drilling operation “cannot result in the imposition of any of the contractual penalties because the obligation to give timely notice of consent is triggered
 
 only
 
 by the required notice of proposed operations.”
 
 El Paso Prod. Co. v. Valence Operating Co.,
 
 112 S.W.3d 616, 623 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (emphasis in original);
 
 see also Dorsett v. Valence Operating Co.,
 
 111 S.W.3d 224, 229 (Tex.App.-Texarkana 2003) (holding that if operator of oil and gas well fails to give proper notice of proposed operations non-consent penalty is not triggered),
 
 rev’d on other grounds,
 
 48 Tex. Sup.Ct. J. 671, 2005 WL 1186289 (Tex. May 20, 2005).
 

 It is not enough that WB and CW — non-parties to the JOA-notified Valence of
 
 their
 
 proposal to drill new wells in the Cotton Valley Sand formation to capture the same reserves that could have been
 
 *318
 
 accessed from the existing wellbores. Such “notice” from strangers to the JOA, coming after the farmout agreement had already been executed, entirely failed to satisfy the purpose of the notice requirement, namely, that Valence be given the opportunity to consent, or not, to a proposal made by a party to the JOA who had agreed to all its terms and conditions-not by strangers to the JOA with different interests. We hold, therefore, that the trial court correctly concluded that Exxon-Mobil’s breach of the notice provision in the JOA relieved Valence of the burden of paying non-consent penalties.
 

 ExxonMobil further contends that, even if we conclude that its breach of contract caused Valence to be subject to non-consent penalties, there is no evidence that Valence sustained damages of $523,432 from the breach. In reviewing a “no evidence” claim, we consider only the evidence and inferences tending to support the trial court’s finding and disregard all contrary evidence and inferences; anything more than a scintilla of evidence is legally sufficient to support the finding.
 
 Cont’l Coffee Prods. Co. v. Cazarez,
 
 937 S.W.2d 444, 450 (Tex.1996). By the terms of the JOA, non-consent penalties were calculated by apportioning all of the non-consenting party’s interest in the well and share of production until each consenting party had recovered 100% of the costs of any newly acquired surface equipment plus 300% of the 'costs attributable to the non-consenting party.
 

 Valence acknowledges that, its non-consent damages were limited to the two wells in which it did not participate (16-4 and 16-5), multiplied by its 18.2% interest times the actual cost of drilling a well, multiplied by 200% (the 300% penalty minus 100% of the actual cost of drilling). At trial, Valence’s experts testified regarding the method used to calculate the amount of non-consent penalties, and these calculations were, both in keeping with the contract and accepted by the trial court. The record reflects that the amount of damages due to non-consent penalties amounted to $523,689.71. The trial court awarded $523,432 due to a calculation mistake in ExxonMobil’s favor that Valence has not challenged on appeal; thus the award was within the range of evidence adduced at trial, and there was no abuse of discretion.
 
 [4]
 
 
 *319
 

 See Stamp-Ad,
 
 915 S.W.2d at 936;
 
 Duggan,
 
 7 S.W.3d at 893.
 

 We overrule this portion of ExxonMo-bil’s third issue.
 

 Attorney’s Fees
 

 In its fourth issue, ExxonMobil argues that the trial court erred by awarding Valence its attorney’s fees in the absence of either pleading or proof that Valence presented its breach of contract claim to ExxonMobil prior to filing suit. Valence replies that a plaintiff who has pleaded all conditions precedent to recovery, as it did, need not provide evidence of presentment unless performance of all conditions precedent is specifically denied by the opposing party. Because ExxonMobil did not specifically plead any failure by Valence to satisfy conditions precedent to recovery of its attorney’s fees, Valence contends that the award of attorney’s fees was proper.
 

 Valence is correct. In its Second Amended Petition, Valence stated that all conditions precedent to recovery had been performed. In its response, ExxonMobil did not deny that all conditions precedent had been performed. Accordingly, the award of attorney’s fees without presentment or proof was not error.
 
 See Cook Composites, Inc. v. Westlake Styrene Corp.,
 
 15 S.W.3d 124, 138 (Tex.App.-Houston [14th Dist.] 2000, pet. dism’d) (holding that, in absence of specific denial, party’s pleading that all conditions precedent have been performed relieves party of burden of proof at trial).
 

 We overrule ExxonMobil’s fourth issue.
 

 Prejudgment Interest
 

 In its fifth issue, ExxonMobil contends that the trial court erred in awarding Valence prejudgment interest. Exxon-Mobil argues that prejudgment interest may be awarded on statutory grounds in a breach of contract case in which the parties to the contract have not agreed on a rate of interest only if the amount of damages is ascertainable from the face of the contract and that Valence did not seek damages ascertainable from the face of the JOA.
 
 See
 
 Tex. Fin.Code Ann. § 302.002 (Vernon 1998). ExxonMobil also argues that Valence is not entitled to prejudgment interest on equitable grounds because such an award is intended only to compensate a party who has, as the result of the defendant’s conduct, lost the beneficial use of its funds between the occurrence and the time of judgment, and ExxonMobil had neither used nor detained money belonging to Valence. ExxonMobil points to evidence in the record that it did not demand payment from Valence for any of the drilling costs of the Cotton Valley Sand wells; nor has Valence paid any of these costs. Exxon-Mobil also points to evidence that it had neither charged nor received any non-consent penalties with respect to two of the wells. Finally, ExxonMobil argues that the prejudgment interest awarded was excessive.
 

 Valence responds that, when no enabling statute applies, as is the case here, prejudgment interest in a breach-of-contract action is properly awarded pursuant to section 304.003 of the Finance Code. We agree.
 

 The contract does not specify the rate of interest; thus reliance on the Finance Code was the appropriate means to determine the applicable interest rate at the time of judgment — 10% per annum.
 
 See
 
 Act of May 22, 1997, 75th Leg., R.S., ch.
 
 *320
 
 1008, § 1, 1997 Tex. Gen. Laws 3093, 3435 (amended 2003) (current version at Tex. Fin.Code Ann. § 304.003 (Vernon Supp. 2004-2005)).
 

 We hold that the trial court did not err in awarding prejudgment interest of 10% per year on the non-consent penalties.
 

 We overrule ExxonMobil’s fifth issue.
 

 Conclusion
 

 We affirm the judgment of the trial court.
 

 [1]
 

 . Tex.R. Civ.P. 11.
 

 [2]
 

 . Texas Rules of Civil Procedure 190 ef
 
 seq.
 
 provide for limitations on discovery to be set by default when the parties have not agreed on a discovery plan and the court has not ordered one; Rule 63 provides for amendments to pleadings up to seven days before trial, while Rule 66 permits amendments even during trial "when the presentation of the merits of the action will be subserved thereby.” Tex.R. Civ. P. 190, 63, 66.
 

 [3]
 

 . ExxonMobil also argues that the trial court erred in basing its interpretation of the MOI provision on inadmissible extrinsic evidence — namely, a different joint operating agreement between ExxonMobil and a third party and internal correspondence reflecting the substance of communications between ExxonMobil and a third party — which Valence offered to show ExxonMobil's construction of the JOA. Valence replies that, at the time the evidence of an unrelated contract was offered (on the first day of trial), Exxon-Mobil had pleaded that the MOI provision was ambiguous, thus presenting a fact issue as to the parties' intent, which justified the introduction of extrinsic evidence.
 
 See Friendswood Dev. Co. v. McDade
 
 + Co., 39 Tex. Sup.Ct. J. 874, 926 S.W.2d 280, 283 (Tex. 1996). Valence contends, and the record reflects, that the parties agreed at trial that
 
 *315
 
 the JOA was unambiguous; they disagreed only as to its correct interpretation. Because our conclusion is dispositive of ExxonMobil’s issues regarding the proper construction of the contract and breach of contract, we do not consider ExxonMobil’s argument that the trial court based its interpretation of the JOA on improperly admitted evidence.
 

 [4]
 

 . ExxonMobil complains that Valence has not paid its share of the costs of drilling the wells. It also argues that the amount awarded was excessive because Valence did not perform a net-cash-flow calculation for two of the wells for the period of the 300% penalty and did not discount to present value its incorrectly alleged damages figure. Valence points to evidence in the record that it has not been paid for its share of the production from those wells and argues that ExxonMobil is arguing offset, an affirmative defense that it did not plead and has therefore waived. Valence also argues that ExxonMobil’s argument that drilling costs were not discounted to present value is meritless because it did not recover damages for future drilling. Moreover, the argument that it failed to perform a cash flow calculation for the period of the 300% penalty paid into the future and then discounted to present value is without merit because the amounts of money it would have gotten had it not been in the penalty situation and the amounts that had accrued as of the date of trial would have been reverse discounted to bring them to present value. Valence further contends that most of the non-consent penalty had been recovered by WB at the time of trial and that any discount factor on the unpaid balance would be more than offset by the reverse discount on the amounts already accrued.
 

 Because Valence's damages from enforcement of the non-consent provision were established by expert testimony and ExxonMobil has not challenged on. appeal the qualifications of Valence’s expert or the reliability of the methodology used to calculate these damages, and because the trial court heard evidence of the formula used to calculate the extent of the non-consent penalties and applied that formula, we will not recalculate
 
 *319
 
 Valence’s damages.
 
 See Helena Chem. Co. v. Wilkins,
 
 47 S.W.3d 486, 499 (Tex.2001) (noting that trial court has broad discretion to determine admissibility of expert testimony, and we will reverse only under abuse of discretion standard).